Mary Marut, Plaintiff-Appellant, v. John Costello and Marge Costello, Defendants-Appellees.

Gen. No. 49,277.

First District, Second Division.

December 1, 1964.

Jerome H. Torshen, of Chicago, for appellant.

J. V. Schaffenegger, of Chicago (James P. Chapman, of counsel), for appellees.

MR. JUSTICE BRYANT delivered the opinion of the court.

This appeal is from a judgment entered in the Circuit Court of Cook County, Illinois, February 21, 1963, on a jury verdict finding for the defendants-appellees in plaintiff-appellant's suit for damages resulting from injuries sustained on appellees' premises.

The central issue which the appellant raises before this court is whether the constant references to what she claims are unrelated injuries and illnesses, and questions concerning her mental condition deprived her of a fair trial.

In July of 1958 the appellant was working as a waitress in the Blackhawk Restaurant in Chicago. On that date she slipped while at work, sustaining a severe injury to her neck and shoulder, the treatment of which required several operations. Dr. Robert McElvenny of Chicago treated the appellant for both this injury and the injury presently before

this court. She was still recuperating from this first fall almost two years later on March 3, 1960, when she claims she incurred the injury on which this suit is based.

According to the appellant, she was, on March 3, 1960 a tenant in the first floor apartment of a building located at 3939 North Janssen Avenue, Chicago, and owned by the defendants. On that date, shortly after noon, a neighbor came to the appellant's apartment and asked her to look after her baby while she went to the store. The neighbor gave the appellant the back door key to her apartment, and about 20 minutes later, the appellant went upstairs to look in on the baby, using the open back stairway of the apartment building. The appellant testified at the trial that when she went to look at the baby, she was wearing laced oxford nonskid work shoes which she had worn as a waitress, and that while climbing the stairs, she observed that it was icy and snowy between the first floor landing where she lived and the second floor landing where the neighbor lived. She claims there was an overhanging gutter in that area, which gutter was cracked or rusted so that water leaked from the gutter and froze on the stairs and landing when the weather was cold enough. There was testimony from the appellant and from others who had lived in the building that the janitor had not cleaned off the back stairway for quite some time.

The appellant testified that as she was coming back down the stairs, after having looked in on the baby, she slipped and fell, thereby injuring her back. It is for the injuries resulting from this fall that the appellant brought her suit in the court below.

The appellees set up several defenses to the complaint. They denied any negligence and alleged that

the appellant was contributorily negligent. They denied that she ever fell on the back stairway and claim that the injury of which she complains was caused by the fall which she incurred while working as a waitress at the Blackhawk Restaurant almost two years before.

At the trial, the appellees adduced evidence from several residents of the apartment building that the back stairway was kept clean of ice and snow during the period the appellant claims she fell. The janitor of the building testified that he particularly remembered the day because it was his son's birthday, and that he recalled cleaning the stairs that day.

During the trial, the appellees cross-examined Mrs. Marut and Dr. McElvenny at some length about the fall which took place at the Blackhawk Restaurant in 1958, and the resulting injuries. The only evidence the appellees brought out on this matter was in these cross-examinations. On her cross-examination the appellant denied that she ever complained of pains in her low back before March of 1960. Dr. McElvenny testified that there was no connection between the fall at the Blackhawk Restaurant and the injury to the lower back of which the appellant complains here.

On these cross-examinations, the appellees brought into evidence the record of the Industrial Commission, which heard the appellant's claim relating to her fall at the restaurant. These hearings took place both before and after the accident complained of here. In testimony before the Commission taken on March 7, 1960, four days after the accident, her doctor represented to the Commission that in his opinion the appellant would be unable to return to work as a waitress due to the injury she sustained from her fall at the Blackhawk Restaurant in 1958

344

The appellant had testified before the Commission a few days before her second accident to the effect that her physical condition was not at all good. This testimony was used by the appellees for the purpose of discrediting some or all of the testimony given by Mrs. Marut and her doctor.

The basic point complained of here, is that the attorney for the appellees was permitted, over objection, to question the appellant and her doctor about a possible connection between the injury to the upper back resulting from the fall at the Blackhawk Restaurant, and the injury to the base of her spine which the appellant claims resulted from the fall down the back stairs of the building owned by the appellees. The appellant does not deny that the appellees had a right to cross-examine concerning the prior accident if they can show some relationship between the two injuries. When the appellant objected at the trial that a proper basis had not been laid for the cross-examination concerning the previous accident, the attorney for the appellees said that he would connect the first injury to the latter. The appellant claims that this was never done, and therefore, the testimony pertaining to the earlier fall should have been stricken and the jury instructed to disregard such matters.

The appellant also complains of references to her mental state made during the cross-examination, claiming that such material was totally irrelevant and should not have been permitted. The appellees respond to these claims, saying that both the appellant and her doctor had testified at the trial as to her previous medical history, and therefore, the appellees were entitled to cross-examine these witnesses in depth about all factors relating to these matters. They also claim that aside from the matter being raised on direct examination, the material con-

cerning the appellant's prior condition of health as testified to before the Industrial Commission was relevant to rebut and impeach the claim that the appellant was in fairly good health before her second fall and would have been able to return to work shortly after March 3, 1960, but for her second accident. In addition, the appellees say that the disputed cross-examination was relevant to show that the appellant's claimed total disability was not a proper claim, and that, in fact, she was on March 3, 1960, suffering from a permanent disability.

As further grounds for admitting this material, it is claimed that the evidence before the Industrial Commission shows the appellant's physical condition to have been so weak that it establishes a case of her contributory negligence in undertaking to negotiate stairs which she claims were icy and snowy.

■■■ We hold that evidence was improperly before the jury in that there was no testimony tending to connect the two injuries. The jury should have been instructed to disregard certain portions of the testimony of the appellant and of her doctor.

I.

■■■ During the course of direct examination, the appellant gave the following testimony:

"Q. Mary, did you injure your neck in the year 1958?

"A. Yes, sir, I did.

"Q. Where did that happen?

"A. At the Blackhawk Restaurant.

"Q. Were you employed at the time?

"A. I was.

"Q. Do you recall the exact date of that occurrence?

"A. Offhand, no. Somewhere in July.

"Q. At the time of injuring your neck in that occurrence, did you sustain any injuries to the low back area at the time?

"A. No, sir.

"Q. Do you know the name of the doctor that took care of you for the injuries to your neck?

"A. Dr. McElvenny. Robert McElvenny."

This is the testimony the appellant gave on direct examination concerning the fall she took at the Blackhawk Restaurant. It seems clear from the pleadings in this case that the appellees were going to try to prove that the injuries the appellant claimed she suffered when she fell down the back stairs did not result from that fall, but were the result of the fall she took at the Blackhawk Restaurant almost two years before. As the trial progressed, this is exactly what happened. The appellant was, therefore, trying to protect herself by bringing out the fact of the previous accident before the appellees could do so on cross-examination. Had they waited until the 1958 verdict was raised on cross-examination, it might appear to the jury that the appellant was trying to conceal it. The strategy used by the appellant is a common one, and we do not feel that in protecting herself she waived the right to insist that the injuries be connected to one another by acceptable evidence. The appellees, nevertheless, claim that the cross-examination was appropriate as being within the scope of topics covered on direct examination and, in support of this theory, they cite the case of Muscarello v. Peterson, 20 Ill2d 548, 170 NE2d 564 (1960). In that case the Supreme Court said:

"The rule is, of course, a familiar one that cross-examination of a witness should be con-

347

fined to matters brought out upon direct examination. (Hansen v. Miller, 145 Ill 538.) But in determining the scope of the 'matter' testified to on direct examination the rule is not to be given a narrow or technical application. (West Chicago St. R. R. Co. v. Reddy, 69 Ill App 53.)"

We are not in disagreement with that rule. The purpose of cross-examination is to get at the truth, and too strict a limit on the scope of cross-examination will hamper rather than help to achieve this end. We do, however, feel that the appellees have misapplied this rule in their argument, for this rule, in our opinion, assumes that the direct testimony and the cross-examination will be on matter relevant to the case at bar. We feel that Mrs. Marut's first accident has not been shown by the appellees to be relevant on the question of causation of the injury of which she complains here.

■ There is an Illinois case quite similar to the case at bar. In Caley v. Manicke, 29 Ill App2d 323, 173 NE2d 209, (1961) reversed on nonevidentiary grounds 24 Ill2d 390, 182 NE2d 206, (1961), cited by both sides in this case, the court dealt with a question of the relevancy of prior accidents. In laying down guidelines for dealing with this problem, the court said:

"Relevancy described evidence that has a legitimate tendency to prove or disprove a given proposition that is material as shown by pleadings. (See 1 Wigmore on Evidence, 3d Ed, Sec 2.) That intervening and contributory causes are material to the issue of proximate cause is implicit in the very nature of things, and taken as a matter of course in actions of this kind. They are material propositions that may be

proved. The question here is whether the evidentiary facts offered by defendant did prove either one or both of them. Relevancy has been defined as a tendency to establish a fact in controversy, or to render a proposition in issue more or less probable. To be probable, evidence must be viewed in the light of logic, experience and accepted assumptions concerning human behavior."

We feel that the cross-examination elicited by the attorney for the appellees failed to render the proposition in issue more or less probable. We find nothing in the record from which a legitimate tendency to prove or disprove the proposition that the appellant's injuries were caused by a prior accident can be drawn. The claim that the injury was caused by a prior accident is an affirmative defense and the appellees had the burden of proof on this point. Caley v. Manicke (supra).

To show how the appellees failed to elicit evidence to prove their claim, we quote from the cross-examination of the appellant, Mary Marut:

"Q. Isn't it a fact, ma'am, that before the Industrial Commission, that you testified that you were completely incapacitated at that time?

"A. At that time, yes, but I was gradually getting better. There's miracles in everything, and I wish to God I had a miracle in my back.

"Q. We can appreciate that, Mrs. Marut.

"A. Yes, I wish.

"Q. We can appreciate that. Now, Mrs. Marut, you were having trouble with your arms?

"A. Not with my arms. With my arm.

"Q. With your arm?

349

"A. That's right.

"Q. And you were having trouble—

"A. So therefore they took the bursas out.

"Q. All right.

"A. And with the therapy I was getting better gradually.

"Q. Then after they took the bursa out,—that was as a result of this fall at the Blackhawk Restaurant?

"A. That's correct.

"Q. And then your left elbow swelled up, isn't that right?

"A. That's correct. And I worked all the way with it.

"Q. All right. Then after that operation, then they performed another operation and fused the vertebrae in the cervical region of your spine; isn't that right?

"A. That's correct.

"MR. LISCO [Attorney for the appellant]: Judge, may I be assured by counsel that he will attempt to tie up any reference to a cervical fusion with the occurrence that is the subject matter of this litigation?

"THE COURT: Are you going to connect this, counsel?

"MR. SCHAFFENEGGER [Attorney for the appellees]: Yes, your honor.

"THE COURT: All right.

"MR. SCHAFFENEGGER: Not medically, but by testimony.

"MR. LISCO: Did you say "Not medically?"

"MR. SCHAFFENEGGER: Well, I'm not a doctor."

This is some of the testimony the appellant gave on cross-examination concerning the condition of her

upper back. Part of the record of the testimony she gave before the Industrial Commission a few days before her second accident was read into the record, and there were further questions about her condition before the accident. At various times, counsel for the appellant renewed his objection to this line of questioning, unless the two injuries were shown to be connected. The Court overruled these objections. Clearly, nothing was elicited on this cross-examination which shows any connection between the injury sustained in the fall in the Blackhawk Restaurant and the injury to the appellant's lower spine which she says she sustained when she fell down the stairs in the appellees' building.

## II.

We now turn to the testimony given by the appellant's doctor, Robert McElvenny. On direct examination by the appellant's attorney, the following testimony was given:

"Q. . . . Would you tell us whether or not this lady was under your care for any condition prior to March 3rd, 1960?

"A. Yes, she was.

"Q. And for what reason or purpose was she under your care prior to that date, sir?

"A. Well, the first time I saw Mary Marut was in 1958 when she came in from falling on a wet floor with a great big bursa on her elbow, on her left elbow. She also complained then of some pain in her left shoulder.

"Q. Now, Doctor, you have seen Mary Marut from 1958 up to the time that you say you saw her in connection with her low back in March of '60?

351

"A. Oh, yes.

"Q. Do you know, Doctor, whether or not Mary Marut had any time from 1958 up to the time of March 4th, 1960, ever complained of any low back pain to you?

"A. No, never.

The Doctor then described the treatment he gave as a result of the appellant's fall in the Blackhawk Restaurant in 1958. This treatment included three operations. The Doctor was then asked:

"Q. Now, Doctor, did the injury to her neck have any relation to loss of use of the leg, right or left?

"A. No.

"Q. Did it have any connection, sir, with radiating pain from the low back to either leg, right or left?

"A. No."

The Doctor then read an X-ray taken of the appellant a year before the accident. It was an X-ray taken for the bowel, but the Doctor said he could see the lower spine of the appellant in the film, and testified that while the film was not good for details, the bone appeared normal. The Doctor also testified that he operated on the appellant three times for the injury to her lower spine. He said that the preoperative X-rays showed that there was some congenital defect in that area of the spine, but that the injury of which the appellant complains was not caused by this congenital defect, but by a trauma such as the fall of which she complains.

On cross-examination the Doctor again testified that the injury was traumatic in its origin and not congenital. He then gave the following testimony:

"Q. Doctor, do you have an opinion, based upon a reasonable degree of medical and surgical

certainty, whether or not the condition of ill-being, namely, the pain that this patient has been constantly complaining of of [sic] might or could be connected with her fall of March 3, 1960?

"A. Yes.

"Q. What is your opinion?

"A. It could be connected.

"Q. Do you have an opinion, Doctor, based upon a reasonable degree of medical and surgical certainty, whether or not the condition of the herniated nucleus pulposus might or could be connected with her fall of March 3, 1960?

"A. I have.

"Q. What is your opinion in connection with that?

"A. It could be connected.

"Q. Do you have an opinion, Doctor, based upon a reasonable degree of medical and surgical certainty whether or not this patient's injury to her cervical spine in 1958 had anything to do with her present complaints of low back injury today—or low back complaints today?

"A. I have.

"Q. What is your opinion?

"A. No. . . .

"Q. So the fall at the Blackhawk restaurant [sic] resulted in a swelling of the left shoulder— of the left elbow, it was of such severity, she developed a scalenus anticus syndrome where you had to section that muscle, and you had to perform a fusion of her cervical spine?

"A. She had a ruptured disk.

"Q. And she had a ruptured disk at that time?

353

"A. On her cervical spine, yes, sir.

"Q. So the fall she had at the Blackhawk Restaurant was of sufficient intensity and magnitude to require her to have three operations, isn't that right?

"A. Yes.

"Q. And when she fell, she fell on her buttocks, didn't she?

"A. I have no note of that in my notes."

The attorney for the appellees then read into the record testimony given by Doctor McElvenny at the Industrial Commission on March 7, 1960. In that testimony, the Doctor had stated:

"This woman fell backwards. This Woman collapsed hitting her left elbow, her buttocks, and then went backwards like this (indicating). A fall was taken mainly on her left buttock, left foot, her left elbow, and then the sudden stop, and the acceleration of her body, do have . . ."

The cross-examination continued:

"Q. So the impact of that fall was closer to the lumbar spine than it was to the cervical spine, wasn't it, Doctor?

"A. No sir. It all came to the cervical spine and the upper shoulder region. A hip is not a back. You know that.

"Q. Anatomically, Doctor, the lumbar spine is closer to the buttock than the cervical spine, isn't that right?

"A. Oh, sure. *That's what saved it.*" (Emphasis supplied.)

Continuing the cross-examination, the Doctor testified concerning the treatment he gave the appellant for the injury resulting from the fall she took in 1958—the injury to the cervical region of the spine.

354

Later, a discussion arose as to the difference between the cervical region of the spine (that part which runs through the neck) and the lumbar region (the lower back):

"A. There's no difference between the back and the neck. It's back pain and it runs from your head to your tailbone.

"Q. So, it is the entire spine, is that right?

"A. The back, of course.

"Q. And the fact there was a cervical operation, that is still an operation in the back, is that right?

"A. Exactly.

"Q. There could be a connection between the cervical area, the lumbar area, and the thoracic area, and that is the back?

"A. Yes, it better be connected."

What the Doctor said in this last answer is that all the areas in the back are connected to one another anatomically. He did not say that the injuries the appellant sustained in the cervical area and the lumbar area of her spine were in any way connected. We cannot seriously accept the appellees' contention that this is testimony on the part of the Doctor that the injuries were or might have been connected.

On redirect examination, the Doctor testified first, that the injury of which the appellant complains was caused not by a congenital defect, but by a trauma, such as a fall. The appellant's attorney then conducted the following examination:

"Q. . . . Now, you heard reference to the fact that this lady allegedly fell on her buttocks in an accident at her place of employment. Now, Doctor, I ask you again, is there any reference at all in any of your treatment,

355

from the time you saw this patient in 1958 until the time you saw her after March of 1960, any reference at all to any condition in the low back area?

"A. None, nor could we find it in the hospital records. . . .

"Q. Is there any relationship, in your opinion, Doctor, with the patient's present complaint of low back injury and the complaint of low back pain to the cervical injury she sustained in 1958?

"A. No, sir, there is no relationship."

On recross-examination, the following testimony was given:

"Q. Doctor, you say that there was no relationship between this fall in 1958 and the condition of her cervical spine, the condition in her lumbar spine?

"A. I didn't say that, sir. I said there was no relationship between the trouble in her cervical spine and her lumbar.

"Q. But you are not saying that the fall could not have caused this condition to her lumbar spine back at the Blackhawk Restaurant?

"A. I know we never had any complaint referrable to it until when she appeared in 1960."

Is there anything in the Doctor's testimony that would allow the jury to believe that the injury of which the appellant was complaining resulted from the fall she took in 1958? We think not.

The appellant had never complained of a low back injury to the Doctor who had treated her for the injury to her upper spine for almost two years before the accident of which she complains here. Doctor McElvenny then testified that the former injury had no connection with the latter. He could

not say that the injury of which the appellant complains was caused from a fall down the stairs on March 3, 1960, because he was not there. He did testify, however, that the injury was caused by a trauma such as a fall and he also said quite clearly that the injury to the cervical spine had nothing to do with the injury to the lower portion of the back. The Doctor was asked questions designed to make him raise the possibility that the two injuries were connected, but he clearly said that they were not connected. It was admitted that the Doctor testified before the Industrial Commission that when the appellant fell at the Blackhawk Restaurant, she fell on her foot, elbow and buttock, but he also clearly stated at the trial that the buttock saved the lower spine from any injury in that fall. The Doctor then stated once again that there was no connection between the two spinal injuries.

We believe that unless the appellees adduced some further evidence concerning the relationship between the two injuries there was nothing in these two cross-examinations that would allow the jury to infer that these injuries were connected. Counsel for the appellees promised that he would connect the two injuries, and this he failed to do.

The testimony given by the Doctor on cross-examination, if it had a tendency to prove anything, would show that the injuries were not connected, not that they were. Counsel for the appellees constantly suggested that the two injuries might be connected, but he was not on the witness stand, and the witnesses did nothing but deny that the two injuries were connected. We feel, therefore, that this case falls under the rationale of the Caley v. Manicke decision, (supra). See also Home Life Insurance Co. v. Franklin, 303 Ill App 146, 24 NE2d 874, (1940). Unless some competent witness is will-

357

ing to testify that the two injuries are connected, or reasonably might be connected, we do not see how the question of whether the injuries were connected could be before the jury. There was no evidence from which the jury could come to that conclusion. Kantor v. Ash, 137 A2d 661, 215 Md 285 (1958), Krug v. Wanner 145 A2d 612, 28 NJ 174 (1958).

The appellees did call a doctor for their side, but he gave no testimony relating to this issue, and nothing he said could even be remotely described as connecting the two injuries. His testimony went only to the degree of disability the appellant had as a result of her first fall. His testimony was relevant to the question of damages, not to the question of causation of the injury to the lower spine.

██ ██ One of the instructions offered by appellees and given the jury at the close of the case reads in part:

> "Defendants state that they neither committed or omitted any act which in any way caused or contributed to cause any accident or any injuries, and that if plaintiff suffered any accident or injury, as alleged, said accident and injury were the sole and proximate result of the negligence and want of care of the plaintiff in her own behalf, and state that if the plaintiff has any injury or disability *that said injury or disability resulted not from any incident involved in this lawsuit, but that plaintiff was suffering from a previous injury incurred at another time and place."* (Emphasis supplied.)

There is nothing in the record which would warrant the giving of such an instruction. The record is totally devoid of evidence which would permit the jury to find that the previous injury was in any way connected to

358

the latter. The instructions must be based upon evidence in the case, and a statement of an hypothesis of fact virtually tells the jury that there is evidence from which they may believe in the existence of the fact, and if there is no evidence the instruction is misleading. Jurney v. Lubeznik, 54 Ill App2d 372, 204 NE2d 166, Schlauder v. Chicago & Southern Traction Co., 253 Ill 154, 97 NE 233 (1912).

The appellees cite and rely on the case of Kaptain v. Overgaard, 19 Ill App2d 483, 154 NE2d 105 (1958) (Abst.). We have read the text of this opinion and find that it is not controlling in the case at bar.

In that case, the plaintiff had sued for damages arising out of an automobile accident. The defense showed, among other things, that she had divorced her husband and that in her complaint to that divorce, she alleged that her husband had dragged her down some steps. The decision in that case simply restates the general rule that a plaintiff may be cross-examined as to prior injuries. There is nothing in that decision that suggests that there had been no connection made between the two injuries. There is nothing in that opinion to suggest that the question of relevancy was even raised. We do not see how we can be bound by an opinion that does not deal with the problem before us.

■ We hold, therefore, that this evidence was inadmissible to show that the injury of which the appellant complained was caused from her fall at the Blackhawk Restaurant, and that it was error for the court below to give this instruction.

## III.

The appellees next claim that this evidence is admissible for purposes other than to show a connec-

tion between the two injuries. They state in their brief, "Cross-examination about [appellant's] prior condition of health and testimony before the Industrial Commission was relevant to rebut and impeach plaintiff's contention that as of March 3, 1960, her condition of health was fair, that she shortly would be able to return to work as a waitress, and that she fell on March 3, 1960."

It is quite true that at the hearings before the Industrial Commission the appellant's doctor said that he did not think she would be able to return to work as a waitress:

> "The reason I object to her doing waitress work, again, is the transient weaknesses that she will have; the danger of spilling on people is very important."

> "Point Two is I do not consider her balance excellent any more. I do not consider her endurance good. I do not think mentally she is fit for it. These are four basic reasons, and this endurance plus her balance plus her mental condition plus the danger to others, I think, eliminates her as a trusted employee in the work of a waitress."

This evidence is admissible as going to the question of the appellant's damages. She had testified that she earned a certain amount of money each week and that she planned to return to work as a waitress at the time of her second accident. This testimony shows that she could not have returned to work as a waitress, and shows that her earning power may have been reduced by the first accident with which the appellees here had nothing whatsoever to do. Such evidence is also admissible to show that the appellant's claimed total disability was not

due solely to the second accident. The evidence quoted above is relevant and highly probative of the proposition that all the appellant's disability did not arise from this latter accident, but none of this evidence has anything to do with causation of the injury to the lower spine.

Other evidence from the Industrial Commission which was read into the record at the trial shows that the appellant told the Commission that her hands and arms were very weak, that she could do only light cooking, and that the neighbors had to come in to wash and set her hair. The appellees say that this was relevant to show that the appellant was guilty of contributory negligence in attempting to negotiate the icy steps when she did not have enough strength to hold on to the bannister if she should fall. We agree with this contention. It was proper for the court to permit this evidence to go before the jury.

Finally, the appellant objects to the references to her mental condition which were made at the trial. The question of the appellant's mental state first arose on cross-examination of her Doctor in the reading of the transcript of proceedings of the Industrial Commission into the record. This dealt with the Doctor's testifying that one of the reasons he did not think that the appellant could return to work as a waitress was that she was no longer "mentally fit" for the work. This testimony, as we noted before, is admissible insofar as it bears on the question of damages.

Other references to the appellant's mental state were made to show that she had imagined illnesses and wanted the operations which resulted from the second fall. None of this material was followed up or brought to any conclusion. The probative value of it is, therefore, nonexistent while the

prejudice arising from such references to the appellant's mental condition is great. We feel, therefore, that the evidence resulting from this questioning as well as all evidence concerning a bladder condition the appellant had should have been stricken and the jury instructed to disregard it. It was error for the court below not to do so.

We hold, therefore, that the testimony elicited at the trial which went to a connection between the injuries to the cervical spine and the injuries to the lumbar spine should have been stricken by the Court below and the jury instructed to disregard it. We hold that the instruction telling the jury that the appellees claimed that Mrs. Marut's injuries were caused by a previous fall should not have been given, for the jury could imply from this that there was evidence from which to conclude that she had so injured herself. The record is devoid of testimony which would support such a conclusion.

We hold that it was not error to permit the appellees to show that Mrs. Marut had been injured before for the purpose of proving to the jury that all the damages she claims to have sustained were not caused by the fall of March, 1960. We hold that the court below should have stricken references to the appellant's seeking operations and to her so-called "claustrophobia" when it became apparent that there was to be no evidence offered which would back up these claims.

The judgment of the Circuit Court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Judgment reversed and cause remanded with directions.

FRIEND, J., concurs.

362

BURKE, P. J., dissenting:

There was conflicting testimony on the issue of liability. The jury was required to resolve this issue before considering damages. Every reasonable intendment not negatived by the record will be indulged in support of the judgment. The burden is on the appellant to point out reversible error. Under the instructions we assume that the jury found against plaintiff on the issue of liability and had no occasion to consider the question of damages.

I do not think that the defendant can justly complain about the cross-examination. The scope of a cross-examination is largely within the discretion of the trial court. The cross-examination should not be unduly confined. Plaintiff and her physician in their direct-examination testified about her fall at the restaurant, the three operations relating to her cervical spine, her condition of health just prior to March 3, 1960, the three operations that followed and her September, 1960 hospitalization for a gall bladder condition, indicating which conditions they thought related to the March 3, 1960 fall. The defendants had the right to cross-examine these witnesses about all factors relating to these matters. Plaintiff's other injuries and conditions in fact occurred and related closely in time and location to her low back condition and since the fusion to that area was in part required by preexisting congenital defects, defendants were entitled to a wide latitude on cross-examination within the discretion of the trial judge. No abuse of that discretion has been shown. See Caley v. Manicke, 29 Ill App2d 323, 173 NE2d 209.

The cross-examination about plaintiff's prior condition of health and testimony before the Industrial Commission was relevant to rebut and impeach plaintiff's testimony supporting her contention that as

of March 3, 1960 her condition of health was fair, that she shortly would be able to return to work as a waitress and that she fell on March 3, 1960. The disputed cross-examination was also relevant to show that plaintiff claimed total disability and that a period of time of that disability was and would be due in part to causes other than the March 3, 1960 fall. Evidence relating to diagnoses that plaintiff's condition was partially psychosomatic in nature was also relevant. Under the evidence presented in this case wide latitude was properly permitted. No abuse of discretion has been shown. I think that the judgment should be affirmed.